**CROWELL v. BAKER OIL TOOLS, Inc.**

No. 10997.

Circuit Court of Appeals, Ninth Circuit.

Feb. 28, 1946.

973

Joseph F. Westall and Edward Westall, both of Los Angeles, Cal., for appellant.

Mellin, Aurich & Hanscom, Oscar Alvin Mellin, Alfred C. Aurich, and LeRoy Hanscom, all of San Francisco, Cal., for appellee.

Before STEPHENS, BONE, and WILBUR, Circuit Judges.

WILBUR, Circuit Judge.

### Preliminary Statement.

The appellee manufactures and sells tools used in drilling and cementing oil wells; the appellant is an inventor, owning several patents of appliances and methods of cementing oil wells. The appellant claimed that the appellee manufactured and sold four types of apparatus, known as Baker Cement Retainers Model F and Model K, Baker Multiplex Cementing Equipment, and Baker Series Cementing Equipment, and that said apparatus and the method of its use infringed three of appellant's patents; all of which the appellee denies.

To bring the controversy to a head the appellee brought this action against appellant for a declaratory judgment. The appellant denied the allegations of the complaint that appellant's patents were invalid and were not infringed by appellee's devices. The appellant also counterclaimed alleging that its patents were valid and were infringed by appellee. The appellee then in turn denied the counterclaiming allegations of infringement and reasserted the invalidity of the appellant's patents.

The appellant's patents involved herein are: No. 2,168,735, having twenty-three claims, a method patent which was issued to appellant Crowell as assignee of Gilstrap and Baurmann, the inventors, applied for on August 27, 1935, and which was a continuation of application filed September 18, 1931 (stipulated to be the date of invention); No. 2,177,172, an apparatus and method patent to Crowell on October 24, 1939; and an apparatus and method patent No. 2,223,442 granted to Crowell on December 3, 1940.

The appellee sets out in its complaint and in its answer to the counterclaim of appellant forty-nine patents claimed to be anticipatory of the Gilstrap patent and of the Crowell patents Nos. 2,177,172 and 2,223,442.

The trial court decided all the issues in favor of the appellee, declaring the appellant's said patents void as to all claims therein, except claim 16 of Gilstrap patent and claims 1 to 8 and 17 of No. 2,177,172 and claims 1 to 12, inclusive, of No. 2,223,442; and enjoined the appellant from asserting its claims against the appellee's customers. The appellant appeals from the decree.

The number of claims alleged to have been infringed is thirty-four, each, of course, claimed to be a separate but related invention, and all having to do with the discharge of liquid cement, called "slurry," into the annular space between the metal casing[1] which lines the well and the earth formation through which the casing is sunk. The purpose of the cementing is to prevent the circulation or movement of oil, gas, or water from one stratum to another in a complete well; consequently, in a deep well with several strata, some producing water and some oil, it is desirable to prevent interflow by several successive applications of cement at different points or depths in the well. That is accomplished by appellant's method and apparatus and also by appellee's method and apparatus. That they are applicable and usable in the same general field to the same general purposes is not disputed. The appellee's claim is that the prior patents cited by it disclose the invention and negative any new invention by appellant in and covered by the patents in dispute (the Gilstrap and Crowell patents). One of the alleged anticipatory patents is that for which appellant was granted No. 1,828,099, application filed July 28, 1927, issued October 20, 1931.

All except claim No. 16 of patent No. 2,168,735 were alleged to have been infringed by appellee's apparatus and method. Claims Nos. 9 to 18 and 19 and 20 of patent No. 2,177,172, and claims Nos. 13 and 14 of patent No. 2,223,442 to Crowell are alleged by Crowell to have been infringed by appellee. The patent issued on the invention of Gilstrap and Baurmann, supra, (No. 2,168,735) will hereafter be referred to as

---

[1] The word "retainer" is used to name a device intended to allow the cement slurry to pass out of the casing into the surrounding annular space, and to prevent the cement slurry after placement from escaping or returning through the same openings through which it had been discharged. This result was accomplished by a valve which opened downward and not upward.

A "plug" was made, either without openings or so constructed that the opening could be closed to passage of fluid in either direction.

The words "casing" and "tubing" are used interchangeably in some of the patents, but in the opinion we use the word "casing" to indicate the lining of the well and the word "tubing" to indicate a smaller pipe within the casing.

the Gilstrap patent. The two patents issued to Crowell, supra, will be referred to by their last three numerals, 172 and 442, respectively.

Before considering the patents in suit in greater detail, it should be observed generally that the problem involved is the placing of liquid cement, called slurry, in the casing and then lowering the slurry to the point desired to be cemented, then a method of forcing the slurry through perforations or ports in the well-casing into the annular space around the casing where it is to remain and solidify thereby closing the annular space at that point. In the inventions in suit the ports in the casing are within a short section thereof which is lowered into place with the casing string, so that the ports, made before lowering, shall be at the point or points intermediate in the casing where it is desired to force the slurry through the ports into the annular space to be cemented.

### Forty-Nine Patents in Evidence.

The complaint for declaratory judgment presents a claim that the three patents owned by appellant are void. The appellee sets out in its complaint forty-nine patents, giving the names of the patentees and the dates and numbers of the patents, alleging that appellant's three patents are void because in the forty-nine patents the alleged inventions of such patents were invented, known and publicly used and on sale, and sold by each of the respective patentees at the places named in their respective patents. These patents were again presented in the pleadings by the appellee's answer to the counterclaim of the appellant, alleging infringement of his patents.

The appellee offered in evidence the forty-nine patents above referred to and eleven more, which were received without objection. It was stipulated that all patents having a filing date prior to September 18, 1931, may be admitted to show "prior inventorship".

The appellee set up these patents as evidence of prior use, but at the opening of trial appellee informed the court that it would not offer evidence of prior use. Appellant, at the conclusion of plaintiff's evidence, moved "to exclude from the court's consideration any of the forty-nine patents listed in paragraph 16 of the complaint and the same list in plaintiff's answer to our counterclaim, on the ground that they had not been pleaded as required

by statute. [U.S.R.S. § 4920, 35 U.S.C.A. § 69] as patents or printed publication nor had they been pleaded in any way themselves as being anticipations or being pertinent in any regard to the case." The appellant specifies error in the denial of this motion. It was not denied.

The court suggested that the question thus presented was one appropriate to be considered at the conclusion of the evidence. Appellant acquiesced in this suggestion, stating that "perhaps would be the better practice." Thus there was no ruling of which the appellant can now complain. The suggestion of the trial court that the matter was an appropriate one to consider at the conclusion of the case was correct. It was not again presented; on the contrary, at the conclusion of the trial it was stipulated that "evidence that has been received may be considered as to any and all of the issues to which it applies." Moreover, if the evidence was incompetent or immaterial, the presumption on appeal is that the court disregarded such evidence in reaching its conclusion. There is no merit in the point. Therefore, it is unnecessary at this juncture to examine with technical nicety the allegations of the pleadings concerning these prior patents. However, it should be noted that the nature of the pleadings is now controlled by the new Federal Rules governing civil procedure in the district courts of the United States, and not by § 69 of 35 U.S.C.A.(Patents) first enacted in 1870, 16 Stat. 208, U.S.R.S. § 4920.

### The Question of Estoppel as to Claim of Invention.

In its conclusions of law the court stated "that the defendant Erd V. Crowell may not now be heard to claim that Frank M. Gilstrap and Fred W. Baurmann were the inventors of the method claimed in the patent in suit No. 2,168,735." The appellant attacks this conclusion of law as a declaration of estoppel not justified by the pleadings or evidence or findings in the case. The appellee does not attempt to support the conclusion as an estoppel, apparently believing that there was no estoppel, but contends that the conclusion of law was based on a rejection of the testimony of the witness Crowell as unworthy of belief. The record does not sustain that contention. In view of this it is unnecessary to go into the matter at length. It should be said, however, that the conclusion of law apparently resulted from the evidence

that in an interference proceeding involving priority of the Gilstrap method, Crowell, who had also invented a cementing apparatus, the application for a patent for which was then pending (subsequently issued as patent No. 1,828,099), signed a preliminary statement required by the rules of the Patent Office in which statement Crowell alleged that he invented the Gilstrap method at a date prior to the invention claimed by Gilstrap, September 18, 1931. The patent was issued, however, to Crowell as assignee of Gilstrap, Crowell having purchased it from Gilstrap. The appellee claims that the trial court accepted the statement of Crowell made to the Patent Office in the interference proceeding, and thus concluded that Crowell and not Gilstrap invented the method, patented to Crowell as assignee of Gilstrap. Consequently, it is claimed that the patent of the Gilstrap method, having been anticipated by Crowell himself, is invalid for want of invention by Gilstrap. There is clearly no basis for a claim of estoppel in favor of appellee, which was not a party to the interference proceeding.

Notwithstanding the conclusion of law above referred to, the court proceeded in detail to examine the claims in the Gilstrap patent, as well as the other two patents involved, and made specific findings with relation to the priority of certain of these patents. Before considering the patents thus specified, it should be stated that the appellant specifies error in Finding No. 13, which is as follows:

"That in view of the prior art the production of the methods set forth in claims 1 to 15, inclusive and 17 to 23, inclusive, patent No. 2,168,735 [Gilstrap patent] was clearly within the skill of one skilled in the art." Appellant objects to this finding in that it is not sufficiently specific with reference to the items of prior art considered by the court in its conclusion. This is remedied, if need be, by other findings which point out specifically certain patents as anticipatory. The finding complained of is a general finding that there was no invention in the specified claims of the Gilstrap patent.

### The Method of Gilstrap.

The Gilstrap method patent is for a combination of steps and is similar in effect to a patent for mechanical combination or a chemical mixture or combination. As the appellant aptly claims, to anticipate such a combination it is necessary to find in the prior art the same combination having the same steps or their equivalents. It is not enough that one find in the prior art similar steps here and there, because the inventive genius consists in picking out and combining old steps or inventing new ones for use in a new combination.[2] Given a new and useful combination of steps (old or new or both), the patentability of the process depends exclusively upon the quality of skill or genius involved in the combination and its results. If the result is new and desirable, or even if the same but accomplished in a more economical and useful manner, the invention may be patentable; but, if mechanical skill only is required for developing the process, it cannot be patented for to do so would prevent others in the industry from exercising their skill to produce the same or equivalent results, and thus give a monopoly that would cripple the industry instead of advancing it and would reward mere mechanical skill. The first responsibility of determining this question was with the Patent Office, if and when a patent was applied for. Its determination is official and authoritative, subject only to the control of the courts where it can be said that notwithstanding the determination of the Patent Office there was no invention. We need not explore the ramifications of this doctrine; but the weight of the Patent Office determinations depends in part upon the question whether that office considered the patents or uses alleged to be anticipative. In the case at bar the file wrapper of the Patent Office shows that the office considered the Manning Patent No. 1,684,551, and held it was not an anticipation, but Manning Patent No. 2,029,380, although more apt, was not cited or considered in the Patent Office. The Manning Patent No. 1,684,551 shows a method and apparatus for cementing the space between the casing and the wall of the well. The method calls for a deposit of cement at any desired point between the top and the bottom of the well by ejecting the cement through ports in the casing into the annular space. The ports are opened and the process started at the desired point by "dropping" a block of wood into the well to close an opening in a sleeve valve. That method does not apply to use of two

2 Ottumwa Box Car Loader Co. v. Christy Box Car Loader Co., 8 Cir., 215 F. 362.

points of ejection, as in the second Manning method patent or in the Gilstrap method. The second Manning Patent No. 2,029,380, applied for August 11, 1930, issued February 4, 1936, shows a method of ejecting cement through ports in the casing at two different levels, one above and one below the oil sand, to shut off water and to compel the oil and gas to flow upward through the casing instead of through the annular space around the outside of the casing. This plan not only calls for ports in the casing for ejection of cement before the casing is lowered into the well, but also for ports or perforations in a section of the casing in the oil sand, and called a screen. The slurry passes through the screen in a tube, which prevents its escape through the ports in the screen, and into the oil stratum. The casing is then lowered into the well until the screens are in the oil producing stratum, with one set of ports in the casing for discharge of cement above and the other just below the oil formation. The cement is ejected into sacks carried by and around the casing string at each level. The sack, being closed at the bottom and open at the top, prevents the cement from descending and forces it upward. The Manning plan does not provide for cementing the well solidly from top to bottom, being intended merely to protect the oil stratum from water and to direct the oil and gas into the casing and to the surface. Likewise in the Manning method No. 2,029,380 there is no thought of cementing the whole casing. It is true that Manning indicates that the cement could be forced to any desired level by merely increasing the quantity of cement used and by exerting pressure to force the ejected cement to higher levels in the annular space.

If it were true, as Crowell testified, that the only distinction between the Gilstrap method and the older processes was in the ejection through ports prepared in the casing before lowering it into position, then we have clearly anticipation in the Manning patents, both of which call for such preformed ports. But there are other differences in the Gilstrap method. Gilstrap provides for the ejection of cement at lower level ports in such amount as will reach well above the higher ejection ports, to be followed by a second ejection through these upper ports of drilling mud which will carry away the still liquid cement in the space above those higher ports; that to be followed by a further ejection of cement through those ports and on upward in the annular space to the desired height. The lower end of this second discharge of cement will commingle with that in the upper end of the first discharge, and thus will fill the annular space completely, without any space occupied by the drilling mud as it would be by the Manning method. The Manning method avoids the complications of the Gilstrap method by using an inner tube in the screen above described. Gilstrap eliminates the tube and for the second ejection of cement uses the drilling mud confined below the ports of ejection as a barrier or plug preventing the mud and the following cement from going below the ports and turning the mud and its following column of cement outward through the ports and upward through the annular space to the top of the well if desired. The appellant claims that the process of Manning No. 2,029,380 requires that the process be halted until the first discharge of cement hardens, referring to that part of the patent where it is said that the cement is to "set." But that is after the process of placing cement at both levels has been accomplished, just as is done by the Gilstrap method. The appellant seeks to differentiate the methods of Manning and Gilstrap by claiming that the Gilstrap method calls for successive steps of ejection while the cement is still fluid or plastic, and that the Manning method calls for simultaneous ejection at both levels. But a study of the Manning method shows that the whole valve system permits and the method (claims 9 and 11) patented calls for successive steps, while apparatus claim 7 also calls for successive steps.[3]

---

[3] Manning's claims in No. 2,029,380:

"7. The combination with a tubular string in a well bore having a screen at the lower end thereof, of means for delivering separate loads of cement through the string, means adjacent the upper end of the screen and means incorporated into the screen for directing said loads into the bore outside of the string for creating surrounding seals between the string and walls of the bore, said directing means each having an outlet passageway for the passage of the cement from within the string into the bore around the string, and valves controlling said passageways and controlling the flow of said cement, when the cement is subjected to pressure, to cause the cement

If Gilstrap is patentable over Manning No. 2,029,380 it is because Gilstrap shows how Manning could avoid the delay and expense of using a tube in the screen between the upper and lower levels of cementing. The tube in the Manning process, as described, is only a little longer that the thickness of the oil formation, and perhaps it might be considered inconsequential; but, if to accomplish the results of Gilstrap long stretches of tubing were required, Gilstrap might make a most material contribution as to time and expense to the problem of cementing at two levels. There is, then, this obvious and advantageous improvement over Manning; but, if we can say as the trial court did, that this is merely a change involving no inventive faculty, then we may treat Manning's patent No. 2,029,380 as a clear anticipation.

The question whether or not a new and useful combination is the result of mere mechanical skill or of inventive faculty is one of fact.[4]

The issuance of a patent creates a strong presumption in favor of invention but it is not conclusive.[5] The finding of the trial court can only be reviewed by an appellate court when there is manifest error in the finding. Before determining the factual question we will consider other evidence and findings bearing on that question.

### 1926 Method as an Anticipation of Gilstrap Patent.

It is stipulated that a method of cementing wells was in common use in 1926. The trial court found that the 1926 method was so nearly like the Gilstrap patent method that no inventive faculty was involved in making the changes in practice necessary to use the Gilstrap method.

The above 1926 method in common use contemplated lifting the casing a short distance above the bottom of the well, cementing at the lower end of the casing by pumping down a plug followed by a charge of cement which flowed around the bottom of the casing and upward; and that was followed by another plug attached to a timber protruding from the lower end and long enough to retain the second plug in the casing when the timber reached the bottom of the well-hole, that is to say, longer than the distance the bottom of the casing had been lifted above the bottom of the well.

It was impossible to determine the exact point to which the cement forced out of the lower end of the casing reached in the annular space outside of the casing owing to the irregularities of the space to be occupied by the cement. The cement was then allowed to harden and afterwards a "sand-bridge," or a mechanical retainer, was established by filling the casing with sand, or with a retainer, immediately below the point where it was desired to begin the further cementing. At this stage of operations the casing was perforated just above the "bridge." A further charge of cement was then pumped down the casing and diverted through the perforations in the casing by the sand-bridge or retainer, and thence upward until the predetermined higher point was reached, where the process could be repeated if desired.

It is pointed out that the method of 1926 necessarily allowed some space to intervene between the upper edge of the hard-

---

to flow through said passageways successively, and accumulate in separate seals in the space between the string and walls of the bore.

\* \* \* \* \* \* \*

"9. The method of cementing a pipe in a well bore which consists in introducing a cementitious material into the well bore, through the said pipe, in separate loads and controlling the application of such material to discharge the loads separately into the well bore around the pipe at different levels and at substantially a continuous operation, then allowing such loads to set to form separate spaced seals between the pipe and the walls of the bore.

\* \* \* \* \* \* \*

"11. A method of setting screen pipe in wells comprising pumping a plurality of spaced superposed charges of cementitious material downwardly through the casing, discharging one of said charges at the lower end of said screen and then discharging the next superposed charge at the upper end of said screen."

The word "tubular" and "pipe" designate the "casing" as we have defined it.

[4] Thomson Spot Welder Co. v. Ford Motor Co., 265 U.S. 445, 448, 449, 44 S. Ct. 533, 68 L.Ed. 1098; R. G. Le Tourneau, Inc., v. Gar Wood Industries, Inc., 9 Cir., 151 F.2d 432; Ralph N. Brodie Co. v. Hydraulic Press Mfg. Co., 9 Cir., 151 F.2d 91; Walker on Patents, Deller Ed., § 25, pp. 112, 115.

[5] Ralph N. Brodie Co. v. Hydraulic Press Mfg. Co., 9 Cir., 151 F.2d 91, which determined the facts on evidence adduced and in conflict.

ened cement which, when fluid, had been pumped through the lower end of the casing, and the lower edge of the cement forced out through the perforations.

In the Gilstrap method the perforations in the casing were made before the casing was lowered into position and were covered by valves held securely in place until the cementing operations at that point were about to begin.

When these perforations or ports were opened, drilling mud was circulated down the casing through the annular space between the casing and the wall of the well, and to the top of the well, to prepare for the cement charge which was to follow, and so to make it certain that there was no serious interference with such circulation and with the deposit of the cement as desired.

As to whether or not the result of the method proposed in the Gilstrap patent was new and useful, it is claimed by the appellant that as the wells became so much deeper, the increased hydraulic pressure of the drilling mud due to the depth of the well, and the increased temperature also encountered in deep wells causes cement to harden more quickly than it otherwise would, and made the old method of 1926 impractical for deep wells. Appellant's statement in that regard is not based upon any competent evidence in the case. It was based on a statement made in the Halliburton patent (Reserve Patent No. 19,570) in evidence, where the inventor of a similar process or method explained the difficulty encountered in cementing in deep wells because of heat and pressure.

Another point manifesting a difference between the old 1926 method and the Gilstrap method was in the fact that the operation in the latter was so expeditious that the first charge of cement coming from the bottom of the well into the annular space commingled with the second charge of cement coming through the ported section of the casing while both charges were still fluid, and that any portion of the cement coming from the bottom and arising above the ported section would be washed out while still fluid by the circulation of the drilling mud through the perforations in preparation for the second cementing operation. No evidence was introduced as to the time element in such operations nor as to pressure and temperature.

The trial court held that it required mere mechanical skill to substitute perforated ports in the casing for the 1926 method of perforating after lowering, as taught in a number of patents in evidence and by Manning's No. 2,029,380 and Boynton's No. 1,673,616. This was a finding of fact that cannot be disturbed on appeal except for manifest error.

Gilstrap No. 2,168,735, Applied for September 18, 1931, Compared with Crowell No. 1,828,099.

Appellee's witness Kriegel testified that Crowell's patent No. 1,828,099, applied for July 26, 1927 and issued October 20, 1931, contains the same combination of elements as limited in any of the claims of Gilstrap's No. 2,168,735 except claim 16. He makes it clear that in his opinion Crowell's No. 1,-828,099 contains in combination all claims of Gilstrap's No. 2,168,735. Crowell, on the other hand, testified that none of his patents disclose the Gilstrap means. He also testified that he was convinced that his No. 1,828,099 application for patent did not disclose or claim the Gilstrap method, and hence that he abandoned his interference proceeding, above mentioned and purchased the Gilstrap invention and took the patent.

The patent to Crowell, No. 1,828,099, did not claim the apparatus or method of a series of steps of Gilstrap. It provides for a discharge of cement through normally closed ports in the casing after washing fluid had circulated through the bottom of the casing and upward around the casing to the surface, the ports having been opened in the meantime and the casing having been plugged below the now opened ports by an actuating plug. In the Patent Office proceeding Gilstrap's attorneys argued that Crowell's No. 1,828,099 did not provide for or make possible multi-stage cementing, and accepted the statement of the Patent Office examiner that, as against Crowell, Gilstrap first showed cementing through two vertically spaced ports through the casing and into the well.

The Crowell patent No. 1,828,099 teaches the discharge of a single charge of cement through ports in the casing after circulation of drilling fluid through the bottom of the casing to the surface to clear out obstructions. The appellant insists that it would be impossible to use the Crowell device in a two-or-more stage cementing, because the plug could not be forced down nor the fluid circulated after

the first discharge of cement. The appellee denies this and points out the passage through the plug, and says that its own weight would carry it down, or that it could be forced down by tubing or other weight or method. This is not the teaching of the patent. In states that the charge of cement is to be forced down and out. Elsewhere it states that the following plug is forced down the well, so as to force the cement outwardly. Crowell in the interference proceedings at first stated that his' No. 1,828,099 anticipated Gilstrap, but he subsequently testified that he had never thought of Gilstrap's method and did not invent it. The finding of fact of no invention in claims of the Gilstrap patent in suit is supported by the prior patent to Manning, No. 2,029,380, and by the 1926 method, above mentioned. This makes it unnecessary for this court to determine whether or not Crowell's patent, No. 1,828,099, was a sufficient disclosure to have anticipated and thus invalidated the claims of the Gilstrap patent.

### Patent to Crowell, No. 2,177,172, for an Apparatus for Cementing Wells.

The Baker patent, No. 1,035,674, for a retainer, applied for January 12, 1912, is found by the trial court to have anticipated claims 9 to 16 and 19 and 20 of the Crowell patent, No. 2,177,172. These claims read upon the Baker patent, save in two distinctions, one that the Crowell patent calls for an anchor of the retainer against axial or longitudinal movement at the point of use, while the Baker patent provides only for anchorage against upward motion. The other point of difference is in means to lower the retainer in the casing while maintaining disposition of the fluid in the casing; that is, the fluid is by-passed by the descending retainer.

With reference to the matter of anchoring the retainer against downward motion, the appellee contends that the fluid below the Baker retainer effectively anchors it against downward motion because the well fluid is held from movement in the bottom of the well. This does not seem to be true because the annular space outside the casing would permit the upward movement of the drilling fluid therein and, consequently, permit the retainer to move downward in the casing. As to the question of means to avoid dislocating the fluid in the well while lowering the retainer the appellant claims that the Baker device would force out all the fluid below it into the annular space as it moved downward in the well, as is usually the case in the plug method of cementing the well. The appellee makes two contentions in reply. First, that the fluid, when the retainer is lowered, can by-pass the retainer around its circumference, which is less than that of the well casing; witness Krieger so testified. Second, that the poppet valve in the bottom of the retainer, although admittedly so rigged as to open downward only, when used was blocked open. Appellee claims, and two of its witnesses testified, that in the practical use of the Baker patent device the valve was blocked open by a wedge of wood or a nail or something of that sort, thus allowing the fluid to pass upward through the valve into and through the retainer. To this the appellant asserts that this would completely destroy the utility of the valve and of the whole apparatus, because no way is provided for removing the wedge or nail when the retainer reaches its destination. The testimony is that the Baker device was used thus for six years, and it is evident that the hydraulic pressure sufficient to pump the cement slurry down through the retainer and valve by extending the spiral spring holding the poppet valve closed would also release and force out the wedge. On the question of the double anchoring of the retainer, that is against both upward and downward pressure, the Baker device was constructed upon the theory that the thing to be then prevented was the return of the ejected cement into and through the retainer by reason of its greater weight over the drilling fluid which was within the casing. This being so, it is contended by the appellee that when it became necessary to anchor the retainer against downward pressure, no inventive skill was required. The trial court held that no inventive skill was required to do so, because prior art patents showed how it might be done.[6] The trial court held that in view of the wedging method of using the poppet valve in the Baker device, No. 1,035,674, the addition of an anchoring device against downward movement of the retainer in Crowell No. 2,177,172 did not constitute invention over Baker No. 1,035,674. The Baker invention and its use was long be-

---

[6] Crowell No. 1,606,402, issued in 1926; Hartman No. 1,640,536, issued in 1930; Crowell No. 1,828,098, issued in 1927.

fore appellant's application for the patent in suit, No. 2,177,172. The latter, as to claims 9 to 16 and 19 and 20, was held to be void. Its other claims 1 to 8, 17 and 18 were not held invalid. The finding that Baker's patent, No. 1,035,674, anticipated Crowell's patent, No. 2,177,172, is thus supported by evidence.

With reference to Crowell's patent No. 2,177,172, the trial court found that apparatus therein described in claims 9 to 16, 18, and 20 was in all respects the same as disclosed in prior patents to Crowell, No.1,828,099 (Finding 15) and that (Finding 16) the patent to Baker, No. 1,035,674, discloses an apparatus which in all material respects in construction and operation was the same as the apparatus described in claims 9 to 16, 18 and 20 of Crowell's patent No. 2,177,172. In its findings (Finding 17) the trial court found that in view of these two patents, Crowell No. 1,828,-099 and Baker No. 1,035,674, the production of the device described in claims 9 to 16, 19 and 20 of Crowell patent No. 2,177,-172 required only mechanical skill. The court also found (Finding 19) that in view of the prior art the production of the apparatus described in claims 9 to 16, 19 and 20 of Crowell's patent No. 2,177,172 was clearly within the skill of one skilled in the art. As a conclusion of law the court held claims 9 to 16, 19 and 20 of said patent No. 2,177,172 to be invalid. Any one of these findings of fact would ordinarily afford a sufficient basis for this conclusion of law, if supported by evidence, and would make the other two findings of fact immaterial; but the appellant points out a curious and unusual situation in that Crowell is held to have anticipated his own patent No. 2,177,172 by his disclosure in his No. 1,828,099 patent. The appellant asserts that the application for patent No. 1,828,099, made July 26, 1927 and granted October 20, 1931, was copending in the Patent Office with his application for No. 2,177,172, applied for January 11, 1937 and granted October 24, 1939. The appellee points to this gap of six years between the granting of No. 1,828,099 and the application for No. 2,177,172 and contends that a claim of copendency is untenable; but appellant bridges this obvious gap by the fact that he applied for and was granted two other patents on the same general disclosure contained in the original disclosure in application for No. 1,828,099, namely, patents No. 1,938,955, applied for December 19, 1928 and granted December 12, 1933, and No. 2,071,389, applied for December 5, 1932 and granted February 23, 1937. The appellant contends that the finding of the trial court (Finding 15) that Crowell's patent No. 1,828,099 disclosed the same apparatus operating in the same manner as that in his later patent is erroneous; that there was no identity as found by the trial court; and advances the argument of copendency as an alternate theory, if the Court's finding is sustained. The result is that if Crowell's No. 1,828,099 was an anticipation of No. 2,177,172 it would merely extend the date of discovery back to July 26, 1927.[7] The appellee assumes that the appellant desires to thus extend the term of his patent but that is not true; he seeks merely to show the curious result of holding No. 1,828,099 to be an anticipation but even so, that No. 2,177,172 was extended and not invalidated. It is stated in appellee's brief, and not denied, that this claim of copendency and its effect is raised for the first time on appeal. While the general rule is that a case cannot be tried on one theory and considered on appeal on another theory, here the appellant has not changed his theory which is that the finding (15) is erroneous; and he emphasizes that argument by showing one result of the error. Other findings are (17 and 19) in part predicated on No. 1,-828,099 being anticipatory. But the finding of anticipation by Baker's No. 1,035,674 (Finding 16) stands alone as a sufficient basis for holding these claims 9 to 16, 19 and 20 of No. 2,177,172 to be invalid. Hence, it is unnecessary to pass upon the anticipatory effect of patent No. 1,828,099.

### Validity of Claims 13 and 14, of Crowell's Patent No. 2,223,442.

The trial court, in its findings (Findings 21 to 25, inclusive) held that these claims did not amount to invention in view of the disclosures of prior art. The appellant testified that the invention over the prior art, notably the patent to Crowell, No. 1,828,099, and that to Boynton, No. 1,673,616, consisted in the substitution of an inner sleeve valve in the place of an outer one covering the ports in the casing through which the cement was to be ejected. The trial court held that this substitution did not constitute invention. If the manufacturer of the patented device,

---

[7] Stringham on Double Patenting §§ 2863, 2863 a; Suffolk Company v. Hayden, 3 Wall. 315.

No. 2,223,442, had been charged with infringement of Boynton's No. 1,673,616 by substitution of an equivalent of the outer sleeve valve, it is difficult to see how the charge could be refuted; yet it is because the alleged infringing device of Baker uses an inner sleeve valve that the appellant charges infringement of his patent, No. 2,223,442. The appellee points out that its alleged infringing device follows the teaching of the prior art more nearly than the patent claims in dispute. Hence, appellee claims that it does not infringe, and that the patent claims 13 and 14 are invalid. The trial court so held. The question of invention is one of fact; and the finding of the trial court is not so clearly erroneous that we can or should hold it wrongly decided.

The finding of the trial court that the patent claims of the patents in suit were not infringed we find it unnecessary to disturb, because we sustain the findings and conclusion of invalidity; which means that there are no patents to infringe in the manner complained of. We, of course, refer only to the claims in dispute.

The appellee claims that the trial court should have decreed the appellant's patents in suit to be wholly void, but in the absence of a cross-appeal that matter cannot be considered.

Decree affirmed.